NOT FOR PUBLICATION                              (Docket Nos. 24, 26)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____
                                        :
PASTOR RICHARD BEATTY,                   :
PASTOR LEOLA BEATTY, and                 :
HARRY HAMPTON,                           :
                                        :
            Plaintiffs,                  :        Civil No. 08-2235 (RBK/JS)
                                        :
        v.                              :        **OPINION**
                                        :
TOWNSHIP OF ELK, ELK POLICE              :
DEPARTMENT, CLAYTON BOROUGH              :
POLICE DEPARTMENT, BOROUGH OF            :
CLAYTON, WILLIAM J. RAINEY, JR.,         :
STEPHEN B. BROGAN, DENNIS R.             :
MARCHEI, WALTER P. GARRISON, II,         :
LANCE HITZELBERGER, VICTOR               :
MOLINARI, JOSEPH PIERSON,                :
KEVIN PRZYBYSZEWSKI, OFFICER             :
FOLEY, MARK KONNICK, and                 :
JOHN DOE 1-9,                            :
                                        :
            Defendants.                  :
_____ :

**KUGLER**, United States District Judge:

This matter raises allegations of individual and systemic police violations of Plaintiffs'

constitutional rights.  Presently before is 1) a Motion for Summary Judgment by Defendants

Clayton Borough Police Department, Borough of Clayton, Chief Dennis R. Marchei, Officer

Foley, and Sergeant Mark Konnick (collectively, the "Clayton Defendants") (Docket No. 24);

and 2) a Motion for Summary Judgment by Plaintiff Harry Hampton (Docket No. 26) against

Konnick and Foley, and Corporal Victor Molinari and Officer Joseph Pierson of Elk Township (collectively, the "Elk Defendants"). For the reasons discussed below, the Clayton Defendants' Motion is granted in part and denied in part. Hampton's Motion is denied.

## I.    BACKGROUND

Plaintiffs Pastors Richard and Leola Beatty own the lot and a three-bedroom house located at 535 8th Avenue, Elk Township, New Jersey. The home is located in the "Lawns" section of Elk Township. This area, which borders Elk Township and the Borough of Clayton, is a known high crime area.

As of December 12, 2006, Plaintiff Harry Hampton, an African American, resided at the Beatty's Elk Township house. Hampton claims that on the morning of December 12 (sometime shortly before 11 a.m.), he was waiting outside his home for Pastor Richard Beatty to pick him up to go to work. Hampton was wearing a light brown work outfit and a black wool hat. Next to the house is an empty field, also owned by the Beattys, which is bordered by some train tracks. The tracks border the Borough of Clayton and Elk Township. The empty field was filled with high grass. According to Hampton's deposition testimony, from a sitting position, the grass was at least as tall as his head, making it at least several feet high. See Clayton br.(#24), Ex. A at 24-25:13-25, 1. While waiting to be picked up, Hampton was walking in the field and along the railroad tracks.

While Hampton was walking along the tracks, Sergeant Mark Konnick, a Clayton Police Officer, approached from Clayton in a marked patrol car. Konnick noticed Hampton looking at him as he drove, and in fact noticed Hampton crane his neck and continue to stare at him as he drove past. Konnick thought this behavior odd and circled the block, whereupon Hampton again

2

stared at him as he drove past.  On Konnick's second pass, Hampton was in Elk Township in the Beattys' field.  Hampton does not deny staring at Sergeant Konnick on either pass.  See Clayton 56.1 stmt.(#24) at ¶ 23; Pl. 56.1 stmt. (#38) at ¶ 23, see also Hampton 56.1 stmt. (#26) at ¶ 13. At some point, seemingly during the second pass, Konnick alleges that Hampton either ducked or sat down in the field, though Hampton disputes this assertion.

Based on this behavior, and because the area was a high crime area where there were recently a number of thefts, Konnick suspected that Hampton could be acting as a lookout for a theft.  Specifically, Konnick testified at his deposition that people had been coming into town and posing as contractors to rob people.  In one instance, the thieves lured an elderly woman out of her home, purportedly to identify the property line, while a cohort snuck in the back and stole her jewelry.  See Clayton br.(#24), Ex. F at 31-32:18-25, 1-11.  Against this background, Konnick decided to ask Hampton some questions.

However, because Hampton was in Elk Township, Konnick first called Corporal Molinari of the Elk Township Police Department to advise him of a suspicious person in Elk.  Molinari soon arrived and stated that he did not recognize Hampton.  Konnick and Molinari then approached the house and questioned Hampton on the walkway in front of 535 8th Avenue.  At some point before either officer spoke to Hampton, Konnick alleges that Hampton walked up the driveway of the home across the street from 535, but walked back towards the officers, seemingly as they arrived.  Konnick and Molinari were eventually joined by Officer Foley of Clayton and Officer Pierson of Elk.  All four officers arrived in separate, marked police cars.

At this point, exactly what happened is in dispute.  The following is Konnick's account of the encounter (taken in large part from Konnick's police report, Clayton br.(#24), Ex. G):

3

Konnick greeted Hampton and asked him why he was walking along the tracks and hanging out in the open field.  Hampton responded that he was just going for a walk and he that he lived in the house adjacent to the field (535 8th Avenue).  Konnick then asked for identification and Hampton said he did not have any, that it was in the house.[1]  During this time, Hampton had his hands in his pockets, so Konnick asked if he could pat him down.  Hampton agreed and Konnick did so, removing a lighter, a key, and a cell phone from Hampton's pocket.  These items were placed on the hood of one of the police cars.  Hampton then stated that the house belonged to his pastor and that he was staying there.  Konnick asked him the address and Hampton did not know the house number.  Hampton then stated that he was tired of the police harassing him.  Konnick then told him that the area had recently been victimized by burglaries and thefts, to which Hampton responded that he did not steal anything.  Konnick told him he was not accusing Hampton of stealing, but questioned him why he was watching Konnick as he drove past.  Hampton said that he was watching because the police were harassing him.

At that point, Konnick requested a warrant check on Hampton.  During the warrant check, Officer Garrison of Elk advised Corporal Molinari that Hampton did in fact live at 535 8th Avenue.  At some point during this encounter, Molinari took Hampton's key and tried the lock on 535 8th Street, confirming that the key worked.  Molinari did not open the door.  Hampton's items were then returned to him and the officers left.  The entire incident lasted sixteen minutes according to Clayton records.

_____

[1] Whether Hampton produced ID is particularly unclear.  The Clayton Defendants admitted in their responsive statement of material facts to Hampton's Motion that Konnick requested Hampton's ID and he said he did not have any.  See Clayton 56.1 stmt.(#34) at ¶ 28.  However, the Clayton Defendants stated in their own statement of material facts that Hampton did hand Konnick identification.  See Clayton 56.1 stmt.(#24) at ¶ 6.

Officer Foley's role in the interaction was quite limited in comparison.  He seemingly arrived approximately three minutes after Konnick and Molinari approached Hampton and were already speaking to him.  Foley never asked Hampton any questions, did not search him, and did not have any physical contact with him.  Pierson's role likewise appears limited, though it is disputed.  According to him, he only arrived at the end of the encounter with Hampton.

Hampton's account of the interaction (as taken from his deposition, Clayton br. (#24), Ex. A) is quite different.  He stated that the first thing Konnick asked was for his identification, which he produced.  Then as Hampton was talking to Konnick trying to tell him that he was a Christian and would not bother anybody, Konnick pushed him and told him to shut up.  Hampton then claims that Konnick demanded that he put his hands on his head, whereupon Konnick put his hand in Hampton's pocket, taking his lighter, cell phone, and key.  Hampton claims that Konnick never asked permission to pat him down or seemingly to take his possessions.  Hampton then acknowledges that they ran his supplied information, and thereafter let him go, after checking that his house key worked.

As is relevant to the present Motions, this interaction with police was not the first of its kind for Hampton.  Indeed, on October 31, 2006, several officers entered the home at 535 8th Avenue and questioned Hampton.  Some dispute exists as to whether those officers were from only Elk Township, or from Elk Township and the Borough of Clayton.  Apparently the purpose of the October 2006 questioning was to determine whether Hampton and the Beattys had a proper certificate of occupancy.  Notably for purposes of the present Motions, Corporal Molinari was alleged to have participated in the October 2006 event, and thus seemingly should have recognized Hampton in December 2006.

5

Hampton also had some additional involvement with police on December 11, 2006.  He alleges in the Complaint that some unknown John Doe police officers stopped him, requested identification, shined a light in his eyes, and told him he looked suspicious.  After these unknown (and as yet unidentified) officers ran a warrant check, they let him go.  Finally, on January 1, 2007, Hampton claims two Elk Police officers stopped him while he was riding his bike to question him, eventually letting him go.

On the basis of these events, Plaintiffs filed a ten count complaint on May 7, 2008, alleging various federal and state law violations.  Unfortunately, Plaintiffs' Complaint is not a model of clarity and thus exactly what is claimed against whom is unclear.  In a very general manner, the counts can be summarized as follows:[2]

| Count: | Caption: | Causes of Action: | Defendants: |
|---|---|---|---|
| Count I | "Police and Mayor's Search of 535 8th Avenue and Seizure of Plaintiff Harry Hampton" | 1) N.J. Const.<br>2) 42 U.S.C. § 1983<br>3) N.J.S.A. § 10:5-1 (New Jersey Law Against Discrimination (LAD))<br>4) N.J.S.A. § 10:6-1 (New Jersey Civil Rights Act (NJCRA)) | 1) Township of Elk<br>2) Elk Police<br>3) Mayor Rainey<br>4) Chief Brogan<br>5) Officer Garrison<br>6) Officer Molinari<br>7) Officer Pierson<br>8) Officer Przybyszewski<br>9) John Does 1-10 |
| Count II | "Illegal Seizure of Plaintiff Harry Hampton during Search of 535 8th Avenue" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Township of Elk<br>2) Elk Police<br>3) Mayor Rainey<br>4) Chief Brogan<br>5) Officer Garrison<br>6) Officer Molinari<br>7) Officer Pierson<br>8) Officer Przybyszewski<br>9) John Does 1-10 |

[2] Plaintiffs stipulated to the dismissal of all claims against the County of Gloucester and the Gloucester County Sheriff, who were originally defendants in this action.  See Docket No. 9. Plaintiffs also stipulated to the dismissal of Plaintiff City Harvest World Outreach Church, an original plaintiff.  See Docket No. 20.

| Count III | "Violations of Freedom to Assemble and Right to Exercise Religion by Entering and Searching of 535 8th Avenue" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) "Defendants" |
|---|---|---|---|
| Count IV | "December 12, 2006 Stop of Harry Hampton" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Township of Elk<br>2) Elk Police<br>3) Borough of Clayton<br>4) Clayton Police<br>5) Officer Garrison<br>6) Officer Molinari<br>7) Officer Pierson<br>8) Officer Foley<br>9) Chief Brogan<br>10) Chief Marchei<br>11) Officer Konnick |
| Count V | "January 1, 2007 Stop of Harry Hampton" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Township of Elk<br>2) Elk Police<br>3) Officer Hitzelberger<br>4) Chief Brogan<br>5) Officer Przybyszewski |
| Count VI | "December 11, 2006 Stop and Seizure of Harry Hampton" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) John Does 11 through 20<br>2) "Defendants" |
| Count VII | "Elk Township Police Department" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Chief Brogan<br>2) Township of Elk<br>3) Elk Police<br>4) Mayor Rainey |
| Count VIII | "Borough of Clayton and Clayton Police" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Borough of Clayton<br>2) Clayton Police<br>3) Chief Marchei |
| Count IX | "Mayor, Elk Township, and Gloucester County" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Elk Township |
| Count X | "Racial Discrimination" | 1) N.J. Const.<br>2) § 1983<br>3) LAD<br>4) NJCRA | 1) Elk Township<br>2) Borough of Clayton<br>3) Elk Police<br>4) Clayton Police<br>5) Chief Brogan<br>6) Chief Marchei<br>7) Officer Garrison<br>8) Officer Hitzelberger<br>9) Officer Molinari<br>10) Officer Pierson<br>11) Mayor Rainey<br>12) Officer Foley |

| | | | 13) Officer Konnick<br>14) John Does 1-10<br>15) John Does 11-20 |
|---|---|---|---|

The Clayton Defendants filed their Motion on October 28, 2009 and Plaintiff Harry

Hampton filed his Motion the next day.  All parties have appropriately briefed the Motions and

they are now ripe for review.

## II.      STANDARD

Summary judgment is appropriate where the court is satisfied that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of the evidence; instead, the non-moving

party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"

Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at

255).

"[T]he party moving for summary judgment under Fed.R.Civ.P. 56(c) bears the burden of

demonstrating the absence of any genuine issues of material fact."  Aman v. Cort Furniture

Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either

by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by

"'showing' – that is, pointing out to the district court – that there is an absence of evidence to

support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the

moving party satisfies its burden, the nonmoving party must respond by "set[ting] out specific

8

facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  "If the opposing party does not

so respond, summary judgment should, if appropriate, be entered against that party."  Id.

## III.    DISCUSSION

As an initial matter, Plaintiffs and the Clayton Defendants agree that judgment should be

entered in favor of the Borough of Clayton and the Borough of Clayton Police Department as to

Count VIII, which alleges official policy or custom engendering constitutional violations.  See

Clayton br.(#24) at 19; Pl. br.(#37) at 38.  The parties further agree that all claims against Chief

Marchei are unsupported.  See Clayton br.(#24) at 25; Pl. br.(#37) at 38.  The Court therefore

grants the Clayton Defendants' Motion as to Count VII in its entirety and grants the Motion as to

all Counts against Marchei, who is terminated as a party to this action.[3]

Beyond the above clear points of agreement, the pending Motions are opaque in exactly

what relief the parties wish the Court to enter.  The murk in the pending Motions arises from the

scattershot Complaint and the manner in which each count lists seriatim violations and statutory

bases for relief, rather than confining each count to a single cause of action.  The respective

Motions, in turn, generally latch on to various individual claimed violations within several

counts, without *fully* addressing all claimed violations.  For example, Count IV relates to the

December 12, 2006 incident and alleges an unreasonable search and seizure, both of Hampton

and his home, and alleges a loss of privacy and liberty.  The claims are advanced under § 1983,

the LAD, and the NJCRA.  However, while the Clayton Defendants allege that no Fourth

---

[3] Curiously, the Clayton Defendants did not argue that the Court should grant summary judgment as to any of the claims against the Borough of Clayton and the Borough of Clayton Police Department in Count IV.  Thus, both Defendants are still parties to this action for purposes of that Count.

Amendment violation occurred, not once do they or Plaintiffs address the alleged search of his home or the purported violations of LAD or NJCRA in Count IV.  Thus on the basis of the briefs, the Court is unclear at times whether the parties are seeking judgment as to entire counts, or merely seeking judgment as to individual claims within each.  Because of the confusing Motions, the analysis below responds to the specific grounds on which the parties have respectively sought judgment, but only fully discharges specific counts where indicated.

The Clayton Defendants seek summary judgment on Hampton's Fourth Amendment claims arising from the December 12, 2006 search, arguing that they merely conducted a "field inquiry" under New Jersey law, the pat down was reasonable, and Sergeant Konnick was performing his "community caretaking function" under New Jersey Law.  In the alternative, they argue that both Officer Foley and Sergeant Konnick are entitled to qualified immunity.  The Clayton Defendants further seek summary judgment as to Richard and Leola Beatty's Fourth Amendment claims because they did not have any personal contact with Clayton Police officers. Finally, the Clayton Defendants seek summary judgment as to Count X, arguing that Plaintiffs have not shown that any treatment was on the basis of racial animus.

Plaintiff Harry Hampton seeks summary judgment for his 42 U.S.C. § 1983 claim under the Fourth Amendment, arguing that he was seized, the officers lacked reasonable suspicion, and any alleged consent to search was vitiated by an initial and continued violation of his rights. Hampton further seeks summary judgment that Konnick, Foley, Molinari, and Pierson violated his rights under the New Jersey Constitution because they did not obtain valid consent.[4]

---

[4] Notably, Hampton's brief on this second point states that the officers violated "plaintiffs' rights."  See Hampton br.(#26) at 20.  However, Plaintiff's Notice of Motion (Docket No. 26) states that the Motion is only on behalf of Harry Hampton.  Given this Notice, and given

A.      **Hampton's Fourth Amendment Claims Against Mark Konnick**

Essentially both parties have moved for summary judgment as to whether Hampton was searched and/or seized during the December 12, 2006 encounter.  Neither party has discussed whether the Officers' act of placing his key in the door of the residence is actionable.  Accordingly, the Court's inquiry here is limited to the actions against Hampton's person and not against his "home."  See Compl. at ¶ 59(b).  Because the Court finds that genuine issues of material fact exist as to whether the encounter between Hampton and Konnick comports with the Fourth Amendment, both the Clayton Defendants' Motion and Hampton's Motion are denied.

1.      **Qualified Immunity**

The discussion must begin with the qualified immunity defense.  Qualified immunity protects government officials from liability for civil damages where their performance of discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Government officials are entitled to qualified immunity unless, 1) "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right," and 2) "the right was clearly established" at the time of the violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  A right is clearly established if "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "If officers of reasonable competence could disagree on th[e] issue, immunity should be

_____

that the brief only addresses Hampton's consent, the Court will treat the Motion as being made only on behalf of Harry Hampton.

11

recognized." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  The <u>Saucier</u> two-part inquiry is no longer mandatory, and courts are permitted to use discretion as to which prong to apply first. <u>Giles v. Kearney</u>, 571 F.3d 318, 325 (3d Cir. 2009) (citing <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 818 (2009)).  Qualified immunity is a question of law, but disputed issues of material fact will preclude summary judgment on qualified immunity.  <u>Id.</u>

In this dispute, the Clayton Defendants injected some confusion into the inquiry.  The Defendants' qualified immunity analysis proceeds as if Hampton has stated an excessive force claim.  <u>See</u> Clayton br.(#24) at 13.  However, at no point in the Complaint did Hampton allege excessive force, rather he alleges unreasonable search and seizure.  <u>See</u> Compl. at ¶¶ 45-60.  The Court's qualified immunity analysis under the extant Complaint requires inquiry into the well-established standards for field encounters between police and the public.  Under this inquiry, prong two of the <u>Saucier</u> inquiry is not legitimately in dispute, as the right to be free from unreasonable searches and seizures under these circumstances is clearly established, and has been for some time.  <u>See, e.g.</u>, <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  Thus, the Court's inquiry is confined to prong one: whether the Clayton Defendants violated Hampton's clearly established right to be free from unreasonable searches and seizures under the Fourth Amendment.  As will be shown, the answer is genuinely in dispute.

### 2.    Fourth Amendment

Before turning to the applicable Fourth Amendment standards, the Court must first put a fine point on the parties' respective arguments.  The Clayton Defendants' argument against Hampton's Fourth Amendment claim distills to two essential assertions: 1) he was never searched or seized because he was free to leave and he consented to the patdown; and 2) even if

he had been searched or seized, the officers had reasonable suspicion to briefly detain him and to frisk him.  Hampton's argument is likewise two-fold: 1) he was seized without reasonable suspicion, and 2) any consent was coerced.

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  Police are generally required to obtain a warrant based on probable cause before a search or a seizure.  Terry, 392 U.S. at 20.  However, the Supreme Court has held that a warrantless seizure for purposes of a brief investigatory detention (a/k/a "a Terry stop") is reasonable absent a warrant, provided the officer has "a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  Reasonable suspicion is an objective standard requiring "particularized justification."  See United States v. Crandell (Crandell I), 554 F.3d 79, 84 (3d Cir. 2009) (citing United States v. Mendenhall, 446 U.S. 544, 551 (1980)).  "'Reasonable suspicion [required for a Terry stop] is a less demanding standard than probable cause [necessary for an arrest] and requires a showing considerably less than preponderance of the evidence . . . .  [R]easonable suspicion can arise from information that is less reliable than that required to show probable cause.'"  Id. (quoting United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000)).  At bottom, reasonable suspicion is a totality of the circumstances test.  See United States v. Johnson, 592 F.3d 442, 448-49 (3d Cir. 2010).

However, a court's first step in a Fourth Amendment challenge is to determine if the person was actually seized.  See Crandell I, 554 F.3d at 84.  Not every encounter between police and the public is a seizure.  Id.  Indeed, the Supreme Court has held that a "seizure does not occur simply because a police officer approaches an individual and asks a few questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991); see also United States v. Drayton, 536 U.S. 194, 200-01

(2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.").  Police can pose questions, ask for identification, and even request to search, provided they do not obtain consent through "coercive means."  Drayton, 536 U.S. at 201.  Where a person has the ability to "engage in or terminate the encounter," it is "consensual" and does not implicate the Fourth Amendment.  Crandell I, 554 F.3d at 84 (citing United States v. Wilson, 413 F.3d 382, 386-87 (3d Cir. 2005)).  A consensual encounter does not require reasonable suspicion.  Id. (citing United States v. Kim, 27 F.3d 947, 950 (3d Cir. 1994)).

Under the Fourth Amendment, a seizure only occurs "when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  Terry, 392 U.S. at 19-20 n.16.  The "show of authority" test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person" in light of all the surrounding circumstances.  California v. Hodari D., 499 U.S. 621, 628 (1991) (citing Mendenhall, 446 U.S. at 554).  Factors in this inquiry include:

> [1] the threatening presence of several officers, [2] the display of a weapon by an officer, [3] some physical touching of the person of the citizen, or [4] the use of language or tone of voice indicating that compliance with the officer's request might be compelled.  In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

Mendenhall, 446 U.S. at 554-55 (internal citations omitted).

Of course another well-established exception to the warrant requirement is consent.

Crandell I, 554 F.3d at 87-88.  Whether a party validly gave consent to a search is determined by

14

a totality of the circumstances test.  See id.  Factors in the inquiry include "[1] the setting in which the [search] consent was obtained, [2] the parties' verbal and non-verbal actions, and [3] the age, intelligence, and educational background of the party."  Id. (quoting Wilson, 413 F.3d at 388) (quotations removed).  An officer requesting consent need not inform the citizen of his right to refuse consent, though such a warning is a factor in determining whether the consent was freely given.  Drayton, 536 U.S. at 206-07.

The analysis must now turn to the substance of the parties' arguments.

### a.      Was the encounter a mere field inquiry or was it a seizure?

The Clayton Defendants first argue that Sergeant Konnick engaged in a mere field inquiry, i.e., he approached a citizen in public and posed questions to him.  The Clayton Defendants assert that "[i]t certainly can be argued that this encounter did not even each the level of a Terry stop . . . ."  Clayton br.(#24) at 8.  They further allege that Hampton "admits that the officers never did anything to prevent him from leaving."  Id. (citing Ex. A at 42:18-23).  Unfortunately they misconstrue the record.

While indeed Hampton did admit that the officers never indicated that he could not leave and they never did anything to stop him from walking away, see Clayton br.(#24), Ex. A. at 42:18-23, this only occurred *after* Hampton had already been pushed (as he alleges), ordered to put his hands on his head, and forcibly searched by Sergeant Konnick, who removed the contents of his pockets.  See Clayton br.(#24), Ex. A. at 35-36: 23-23, 1-3.  If Hampton's allegations are true, which the Court cannot determine without weighing evidence, it shows that he was seized at the near outset of the encounter.  Cf. United States v. Crandell (Crandell II), 668 F. Supp. 2d 635, 649 (D.N.J. 2009) (finding seizure where officer told defendant he was "free to leave at any

time" but only after he told him he wanted to pat him down to assure the officers' safety), on appeal to, No. 09-4617 (3d Cir. 2009).  Looking at the Mendenhall factors, Konnick allegedly engaged in physical touching (the push) and Konnick used a tone of voice indicating that Hampton's compliance was compelled.  Under these circumstances, a reasonable person would not feel free to disregard Konnick and end the encounter.  Even if the encounter were not perhaps a seizure at that point, it most assuredly became one when the officers allegedly took and retained Hampton's possessions without his consent, including the key to his home.  Cf. Florida v. Royer, 460 U.S. 491, 503 (1983) (plurality) (holding officers exceeded consent to search where, inter alia, officers had defendant's ticket, identification, and luggage);  Mendenhall, 446 U.S. at 558 (holding defendant consented to search where, inter alia, officers had returned defendant's ticket and identification); United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) (holding no clear error in district court's finding of consent to search where, inter alia, trooper had returned defendant's license).  But see United States v. Ford, 548 F.3d 1, 6 (1st Cir. 2008) (holding retention of property is a factor in totality of circumstances, but not dispositive), cert. denied, 130 S. Ct. 54 (2009).  Thus, the Court cannot grant summary judgment on the basis that the encounter was a mere field inquiry.

> **b.    If the encounter was a seizure, was it supported by reasonable suspicion?**

The Clayton Defendants further argue that even if the encounter was a seizure, it was permissible under Terry because it was justified by reasonable suspicion and limited in scope. Hampton of course argues at great length that the encounter could be nothing other than a seizure, and it was not supported by reasonable suspicion as a matter of law.  See Hampton

br.(#26) at 4-12.  The Court finds that material facts are in dispute for either position.  (For purposes of clarity, the immediate discussion is limited to the stop; the patdown is addressed separately below.)

As discussed, reasonable suspicion is a totality of the circumstances test.  See Johnson, 592 F.3d at 448-49.  It is an objective standard, requiring particularized suspicion.  See Crandell I, 554 F.3d at 84.  Some of the facts relevant to this inquiry are in dispute, thus the Court will attempt to divide the undisputed facts from the undisputed facts, and point out at least two important facts that seem neither disputed nor undisputed.

First, the undisputed facts relevant to the reasonable suspicion inquiry are as follows: 1) Hampton was in a high crime area, which recently had a number of thefts; 2) Hampton was walking along train tracks and then later in a field of high grass; 3) he was dressed in workman's clothes; 4) he stared at Konnick as he passed both times; 5) he crossed the field to approach the Beatty's house; 6) Konnick did touch Hampton (though the amount of force used is disputed), and 7) Konnick has several years of police experience.[5]  See Clayton 56.1 stmt.(#24) at ¶¶ 2, 3, 4, 9, 23, 25; Clayton br.(#24), Ex. F at 31-32:18-25, 1-11, 26:13-14; Clayton br.(#24), Ex. G at 1; Hampton 56.1 stmt.(#26) at ¶ 12.  Second, the disputed facts: 1) Hampton sat or ducked down in the field during Konnick's second pass; and 2) Hampton crossed the street and approached the house across from 535 8th Avenue.  See Clayton 56.1 stmt.(#24) at ¶¶ 24, 30; Pl. 56.1 stmt.(#37) at ¶¶ 24, 30 (denied).  Third, the neither disputed nor undisputed facts: 1) Konnick testified at his deposition that he was aware of crimes in which people posed as contractors, including once

---

[5] Facts three (Hampton's clothing) and seven (Konnick's experience) are not specifically admitted by Hampton, but these facts do not seem in dispute on the record presented.

where the people drew an elderly woman out of her home so a confederate could rob her, and 2)

he testified that in his experience, members of the public generally do not stare at officers as they

pass by.  See Clayton br.(#24), Ex. F at 31-32: 23-25, 1-11; 26:6-16.

On the basis of these facts, the Court finds that whether Sergeant Konnick had reasonable

suspicion depends on disputed material facts.  Hampton alleges that the Clayton Defendants'

only rationale for reasonable suspicion was Hampton's staring at Officer Konnick.  See Hampton

br.(#26) at 10; Pl. br.(#37) at 19 ("All the defendants can prove Mr. Hampton did, in the middle

of the morning, was walk in a field and look.").  However, clearly there is more than that here:

• Hampton was in a high crime area.  While this factor alone does not create reasonable
suspicion, that *plus* other circumstances may give rise to reasonable suspicion.  See
Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Gholson, 181 Fed. Appx.
299, 302 (3d Cir. 2006).

• He actively stared at Konnick both times as he drove past.  This factor again, coupled
with others, informs the reasonable suspicion inquiry.  Cf. United States v. Birnie, 323
Fed. Appx. 172, 175 (3d Cir. 2009) (finding reasonable suspicion where officer had
extensive experience, defendant was near scene of reported crime in progress, the absence
of other persons in the area, defendant's staring at the officer, and defendant's visible
apprehension as the officer approached); United States v. McCargo, 464 F.3d 192, 197
(2d Cir. 2006) (finding reasonable suspicion where defendant was in high crime area,
walking alone, 200 feet from reported crime scene, and staring intently at police);
Schneider v. City of San Clemente, 125 F.3d 859 (table), 1997 WL 599419, at *1 (9th
Cir. 1997) (finding reasonable suspicion where officers had a corroborated anonymous
tip, officers had expertise, and suspect stared intently at undercover officers for three to
five minutes); United States v. Nembhard, 676 F.2d 193, 203-04 (6th Cir. 1982) (finding
reasonable suspicion where, inter alia, defendants stared at agents).

• Even though the staring and most of the undisputed actions here are otherwise innocent
behavior, conduct that is "susceptible to innocent explanation" may give rise to
reasonable suspicion and permit a Terry stop.  Wardlow, 528 U.S. at 125; United States v.
Valentine, 232 F.3d 350, 356 (3d Cir. 2000) ("In many cases, the Supreme Court has
found reasonable suspicion based on acts capable of innocent explanation.").

• Konnick was an experienced officer who was both aware of recent specific crimes
involving purported contractors (which Hampton's clothing would be consistent with)

and he was aware that the public generally do not stare so intently at passing officers.  His experience in criminal matters is essential to the reasonable suspicion analysis.  <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (holding officers are allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

• Hampton's presence along the tracks and in the field of high grass, though potentially innocent, at least gave Konnick pause to look for additional suspicious behavior.

These facts at least plant the seeds for reasonable suspicion, but in the Court's opinion, they are insufficient to objectively give rise to it.  They at most catalog innocent behavior that could give rise to a hunch, but likely nothing more: i.e., no reasonable suspicion that criminal activity was afoot.

However, the above are not the only facts.  Indeed, two disputed facts in the record would be enough, *coupled with the above*, to give rise to reasonable suspicion and a limited stop.  First, Hampton's alleged ducking down or sitting down seems to suggest evasive or nervous behavior.  <u>See</u> <u>Wardlow</u>, 528 U.S. at 124.  Second, Konnick alleged that Hampton seemed to wander away towards a house in which he did not live, which seems to suggest flight upon seeing police.  <u>See</u> <u>id.</u>  This too would seem enough to move the needle from mere hunch to reasonable suspicion.  But as both of these facts are in dispute, the Court cannot say as a matter of law that Konnick's initial seizure of Hampton (if indeed he were seized) was supported.  Therefore, the Court cannot grant summary judgment on that basis to either the Clayton Defendants or Hampton because the Court cannot say as a matter of law whether reasonable suspicion existed.

### c.    Did Hampton consent to a search?

Turning to the patdown and search of Hampton's pocket, Plaintiffs point out that the Clayton Defendants failed to argue consent in their brief in support.  <u>See</u> Pl. br.(#37) at 21.  The

Court's own reading of the moving papers likewise fails to reveal a direct assertion of consent to the search. Assuming for the moment that the Clayton Defendants did move for summary judgment on that basis, the Court must deny the Motion since determining whether Hampton gave consent depends on disputed questions of material fact.

As noted, consent to a search is determined by examining the totality of the circumstances. Crandell I, 554 F.3d at 87-88. Plaintiffs seem to argue that the setting in which the purported consent was obtained was coercive given the initial order to put his hands on his head and the push. See Pl. br.(#37) at 21-22. However, exactly what happened is a disputed question of fact. Konnick stated that he was merely asking questions of Hampton, including whether he could search his pocket, to which Hampton consented. See Clayton br.(#24), Ex. F at 36-37: 20-25, 1-3. If Konnick's version of events are true – i.e., that he calmly asked Hampton questions and that he was always free to leave – nothing about the setting in which the consent was obtained, nothing about verbal or non-verbal actions, and nothing about Hampton's age, intelligence, or educational background suggests that Hampton's consent was anything other than voluntary. However, as this determination is based on disputed facts, the Court must deny summary judgment to the extent that the Clayton Defendants assert the search was consensual.

**d.      Did the officers have reasonable suspicion to search Hampton?**

Even absent consent, the Clayton Defendants argue that Konnick had clear reasonable suspicion to conduct a patdown search of Hampton under Terry. Clayton br.(#24) at 9. Hampton argues that he is entitled to summary judgment for the search because the record discloses that Konnick had no reasonable and articulable belief that he was armed and dangerous. Hampton br.(#26) at 18. The Court cannot reach either conclusion on the basis of the present record.

A <u>Terry</u> stop requires two inquiries: 1) whether the officer had reasonable articulable suspicion to stop the person; and 2) whether the officer had reasonable and articulable suspicion to frisk the person.  <u>United States v. Focareta</u>, 283 Fed. Appx. 78, 83 (3d Cir. 2008).  A protective frisk must be limited to discovering whether the person is armed; it is not a general search for evidence of crime.  <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972).  Thus, the frisk must generally be confined to the outer clothing, and a further intrusion under the surface of the clothing (e.g., into a pocket) must be limited to where the officer discovers evidence of a weapon upon the initial patdown.  <u>See</u> <u>Terry</u>, 392 U.S. at 29-30.  However, an officer can forgo the general patdown and can reach directly into the area where the officer has a reasonable suspicion that a weapon is stored.  <u>See</u> <u>Adams</u>, 407 U.S. at 147-48 (permitting reach into waistband for gun); <u>Focareta</u>, 283 Fed. Appx. at 132 (permitting reach into pocket for gun).

Here the record merely reveals that Konnick saw Hampton with his hands in his pockets, and reveals that he asked if he could pat him down for officer safety, and to verify if he had identification.[6]  <u>See</u> Clayton 56.1 stmt.(#24) at ¶ 31.  Without a doubt, a suspect placing his hands in his pockets can give rise to a reasonable suspicion that he is armed.  <u>See</u> <u>United States v. Connolly</u>, 349 Fed. Appx. 754, 757 (3d Cir. 2009) (finding officer had reasonable suspicion to frisk where suspect immediately placed his hands in his pocket after officer identified himself and where suspect refused a direct order to remove them); <u>Focareta</u>, 283 Fed. Appx. at 83 (finding officer had reasonable suspicion to frisk where, inter alia, suspect was in high crime area early in the morning and suspect placed his hands in his pockets after officer confronted him).

_____

[6] The Clayton Defendants do not present any support that this later rationale for performing a patdown is justified under the Fourth Amendment.

Given the totality of the circumstances (assuming that the initial stop, if any, was justified),

coupled with Hampton placing his hands in his pockets shortly after being confronted, it seems

as if Konnick had reasonable suspicion to initially frisk Hampton.  However, what the record is

silent on, and what is important to know to determine if Konnick violated the scope of the frisk,

is what if any justification Konnick had for entering the pocket.  The record is silent on whether

Konnick believed he felt a weapon in Hampton's pocket and was thus justified in entering it and

removing the contents thereof.  Without this information, the Court cannot determine if Konnick

exceeded the scope of the permissible search.  Hampton, for his part, has not squarely addressed

whether what Konnick felt when he touched the pocket justified entering it.  Thus, the Court

cannot grant summary judgment for either Konnick or Hampton.[7]

---

[7] The Clayton Defendants also argue that any warrantless conduct was justified by the community caretaker doctrine.  See Clayton br.(#24) at 10.  The Court can dismiss that defense in short order.  The community caretaker doctrine "recognizes that the police perform a multitude of community functions apart from investigating crime.  In performing this community caretaking role, police are 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety.'"  United States v. Smith, 522 F.3d 305, 313 (3d Cir. 2008) (citing United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006)), cert. denied, 129 S. Ct. 488 (2008); see also State v. Brogan, 975 A.2d 377, 384 (N.J. 2009) (holding "police officers perform a wide range of social services, such as aiding those in danger of harm, preserving property, and 'creat[ing] and maintain[ing] a feeling of security in the community'").  The Supreme Court has recognized that community caretaking functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Cady v. Dombrowski, 413 U.S. 433, 441 (1973).  The doctrine is an exception to the warrant requirement, and police searches or seizures while in pursuit of community caretaking functions are reasonable in some circumstances.  Cf. Ray v. Twp. of Warren, No. 07-2812, 2009 WL 3074776, at *4-5 (D.N.J. Sept. 23, 2009).  At least one court has narrowly defined the community caretaking function as "abating a nuisance."  See Antoine ex rel. Antoine v. Rucker, No. 03-3738, 2006 WL 1966649, at *6 (D.N.J. July 12, 2006).  In this dispute, the record clearly discloses that Konnick was not engaged in aiding the distressed, combating or preventing an actual hazard, or protecting public safety.  He was clearly engaged in a criminal investigation, not abating a nuisance, and thus his actions should have comported with the Fourth Amendment.  Therefore, the Motion for Summary Judgment cannot be granted on community caretaking grounds.

**B.      Hampton's Fourth Amendment Claim Against Officer Foley, Corporal Molinari, and Officer Pierson**

The Clayton Defendants also move for summary judgment on behalf of Officer Foley, arguing that his role in the encounter was limited.  See Clayton br.(#24) at 14-15.  Hampton moves for summary judgment on the basis that all four officers (Konnick, Foley, Molinari, and Pierson) seized him without reasonable suspicion.  Hampton br.(#26) at 17.  The Elk Defendants oppose this assertion, arguing that both Molinari and Pierson could rely on another officer's request for assistance.  Elk br.(#33) at 26.  Further, as to Pierson in particular, they allege that he only arrived at the very end of the encounter, and thus had limited, if any, involvement.  Elk br.(#33) at 27-28.  The Court finds that genuine issues of material fact preclude finding that any party is entitled to summary judgment for the acts of officers Foley, Molinari, and Pierson.

An officer can rely on information from other officers to justify a stop.  See generally United States v. Hensley, 469 U.S. 221 (1985).  However, in a § 1983 context,[8] an officer is directly liable for a constitutional violation of a person's rights by another officer where the first officer has a "realistic and reasonable opportunity to intervene," but fails to do so.  See Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002).  Factors in this determination include whether 1) the officer witnessed the violation, 2) had reason to know a violation was occurring, or 3) could have prevented further harm.  Cf. Ali v. McAnany, 262 Fed. Appx. 443, 446 (3d Cir. 2008).

In this action, a dispute exists as to exactly when each of the officers arrived and what had

---

[8] The Court limits its inquiry here to only the § 1983 claim in Count IV, as none of the parties briefed the standards for a claim under the LAD or the NJCRA.

already occurred.  For example, Foley alleges he arrived only after Konnick and Molinari had already begun questioning Hampton.  See Clayton 56.1 stmt.(#24) at ¶ 42.  Pierson alleges that he arrived after Foley, but around the time the encounter was almost over.  See Elk 56.1 stmt.(#33) at ¶ 25.  Molinari, for his part, alleges in the brief that he arrived *after* Konnick had already started questioning Hampton.  See Elk br.(#33) at 26-27.[9]  Hampton in turn seems to allege that all four officers were present at the near outset of the encounter.  See Hampton 56.1 stmt.(#26) at ¶ 25.  Under these disputed circumstances, the Court cannot determine who arrived when, which is critical to the § 1983 inquiry.  The Court cannot say whether any of these officers witnessed a violation of Hampton's rights and had a meaningful opportunity to intervene, but failed to do so.  Therefore, the Court cannot grant summary judgment.

### C.      Beattys' Fourth Amendment Claim(s)

The Clayton Defendants also moved for summary judgment against the Fourth Amendment claims by Richard and Leola Beatty because they had no personal contact with the Clayton Defendants.  Clayton br.(#24) at 16; Clayton reply(#44) at 10.  Plaintiffs' response is, to say the least, confusing.  Plaintiffs respond by arguing that the Beattys have standing to contest the search of their home on October 21, 2006.  Pl. br.(#37) at 34.  They seemingly make no arguments specifically directed at the December 12, 2006 search of Harry Hampton and the potential search of the house.  Under these circumstances, the Court must grant the Clayton Defendants' Motion.

Unfortunately for Richard and Leola Beatty, not once in the Complaint do they allege that

---

[9] But see Elk br.(#28), Ex. J. at 1 (answer to interrogatories by Molinari acknowledging arrival at same time as Sergeant Konnick).

24

any of the Clayton Defendants had any involvement with the October 21, 2006 search of the house at 535 8th Avenue.  See Compl. at ¶¶ 26, 40.  Plaintiffs cannot amend the Complaint with their Motion, see Ogbin v. Citifinancial Mortg. Co., Inc., No. 09-0023, 2009 WL 4250036, at *3 (D.N.J. Nov. 19, 2009), and since the time for amending the pleadings has now passed, see Docket No. 7 (Scheduling Order), they cannot seek relief for purported violations of their rights in Count I.  Therefore, the Court will grant the Clayton Defendants' Motion as to all claims in Count I related to the October 21, 2006 search of 535 8th Avenue.

Furthermore, the Court is compelled to grant the Clayton Defendants' Motion as to the portions of Count IV related to the search of Harry Hampton on December 12.  The Court is careful here to note that it is not entering judgment as to any purported search of the house at 535 8th Avenue on December 12.  The Clayton Defendants have failed to brief whether that was a search and whether the Beattys have standing to object to the search, and the Court will not engage in that inquiry sua sponte.  But as to the search of Harry Hampton's person, the Court does not believe that the Beattys have seriously stated a claim that they were injured by any intrusion upon Hampton's rights in his person.  Indeed, the law clearly forecloses a person from bringing a constitutional claim for the violation of another's rights under these circumstances. See McGowan v. State of Maryland, 366 U.S. 420, 429 (1961) (holding general rule is that "a litigant may only assert his own constitutional rights or immunities" (quotations removed)). Therefore, the Court grants summary judgment as to any claim in Count IV by the Beattys arising from the search and/or seizure of Hampton's person.

**D.     Count X**

The Clayton Defendants also move for summary judgment as to the entirety of Count X,

which alleges race discrimination.  Clayton br.(#24) at 18; Clayton reply(#44) at 11.  The Clayton

Defendants allege that Plaintiffs have failed to produce any evidence to show racial

discrimination under the New Jersey Constitution, United States Constitution, or the LAD.[10]

Plaintiffs' only response – without any citation to law – is that because the "facts . . .

demonstrate" that Defendants had no proper basis to stop Hampton, it must have been because of

his race.  See Pl. br.(#37) at 38.  The Court disagrees and grants summary judgment for the

Clayton Defendants.

The Equal Protection Clause provides that no state shall "deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  This is not a command

that all persons be treated alike, but rather a direction that all persons similarly situated be treated

alike. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "The central

purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of

official conduct discriminating on the basis of race."  Washington v. Davis, 426 U.S. 229, 239

(1976), or any other suspect classification.  To make an equal protection claim, a plaintiff must

prove that the defendants' actions (1) had a discriminatory effect and (2) were motivated by a

discriminatory purpose.  Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S.

252, 264-66 (1977).  Article 1, Paragraphs 1 and 5 of the New Jersey Constitution are analyzed in

---

[10] Notably, the Clayton Defendants point out that the LAD prohibits discrimination in employment, which is not at issue here.  See Clayton br.(#24) at 18 n.4 (citing Thomas v. County of Camden, 902 A.2d 327, 334 (N.J. Super. Ct. App. Div. 2006).  The Court would add that the LAD also prohibits other discrimination, see, e.g., N.J. Stat. Ann. §10:5-4 (prohibiting discrimination in public accommodations), and would also add that Plaintiffs did not respond to the Defendants' brief to say exactly which provision they believe affords them relief.
The Court further adds that at no point do Plaintiffs discuss what, if any, provision of the NJCRA provides them relief.

the same fashion as the Equal Protection Clause of the United States Constitution.  See Joyce v. City of Sea Isle City, No. 04-5345, 2008 WL 906266, at *21 (D.N.J. Mar. 31, 2008).

Little analysis is required here.  Plaintiffs' entire retort to the Clayton Defendants' well-reasoned Motion is a conclusory response.  Cf. Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992) ("Conclusory allegations of generalized racial bias do not establish discriminatory intent."), aff'd, 998 F.2d 1002 (3d Cir. 1993).  They effectively affirm that they have produced no evidence of racial animus.  Under these circumstances, the Court is not prepared to entertain a race discrimination claim on the sheer fact that Hampton happens to be a minority.  His racial status alone is not evidence of improper treatment.  Therefore, the Court grants the Clayton Defendants' Motion as to the whole of Count X.

### E.    Article I, Paragraph 7 of the New Jersey Constitution

Finally, Hampton moves for summary judgment on the grounds that his rights under Article I, Paragraph 7 of the New Jersey Constitution were violated on December 12, 2006.  See Hampton br.(#26) at 20-21.  This claim can be disposed of quickly.  At no point in Count IV of the Complaint does Hampton state a violation of any right under the New Jersey Constitution. Compare Compl. at ¶ 60 (Count IV) (". . . in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C § 183, and in violation of N.J.S.A. 10:5-1 et seq. and N.J.S.A. 10:6-1 et seq.", with Compl. at ¶ 40 (Count I) (" . . . in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and the Constitution of the State of New Jersey, protected under 42 U.S.C. § 1983, and in violation of N.J.S.A. 10:5-1 et seq. and N.J.S.A. 10:6-1 et seq.").  The Court notes that unlike violations of the United States Constitution, which are actionable under § 1983, the New Jersey Constitution itself provides a

27

remedy for violations of its provisions.  <u>Scully v. Borough of Hawthorne</u>, 58 F. Supp. 2d 435, 459 (D.N.J. 1999).  Hampton pled no claim for relief under the New Jersey Constitution arising from the December 12 encounter.  Indeed, Count IV seems specifically based on violations of the federal constitution.  <u>See</u> Compl. at ¶ 59 ("The actions fo the defendant officers violated the following clearly established and well settled *federal* constitutional rights of: . . ." (emphasis added)).  Hampton cannot now amend the Complaint with his Motion.  <u>See</u> <u>Ogbin</u>, 2009 WL 4250036, at *3.[11]  Therefore, the Count must deny Hampton's Motion for Summary Judgment as to his purported claims under the New Jersey Constitution in Count IV.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Clayton Defendants' Motion for Summary Judgments as to Counts I, VII, and X in their entirety.  The Court **GRANTS** the Clayton Defendants' Motion as to all Counts against Chief Dennis R. Marchei, and he is hereby **TERMINATED** as a party to this civil action.  The Court **DENIES** the Clayton Defendants' Motion as to the alleged violations of Plaintiff Harry Hampton's rights in Count IV, but **GRANTS** the Motion as to all claims by Richard and Leola Beatty arising from the search and/or seizure of Hampton's person.  The Court does not reach the issue of whether any Defendant searched 535 8th Avenue on December 12, 2006 and does not enter judgment for any party on that ground.  The Court **DENIES** Plaintiff Harry Hampton's Motion for Summary Judgment.  An accompanying Order shall follow.

---

[11] Further, to the extent that he seeks relief under the NJCRA, for example, he has failed to discuss it at all (e.g., what the NJCRA provides, what elements of a claim are), and thus failed to show that he is entitled to judgment as a matter of law.

Date:__4-14-10_____                              __/s/ Robert B. Kugler_____
                                                  ROBERT B. KUGLER
                                                  United States District Judge