NOT FOR PUBLICATION                                      (Docket Nos. 25, 28)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                          :
PASTOR RICHARD BEATTY,                    :
PASTOR LEOLA BEATTY, and                  :
HARRY HAMPTON,                            :
                                          :
            Plaintiffs,                   :          Civil No. 08-2235 (RBK/JS)
                                          :
            v.                            :          **OPINION**
                                          :
TOWNSHIP OF ELK, ELK POLICE               :
DEPARTMENT, CLAYTON BOROUGH               :
POLICE DEPARTMENT, BOROUGH OF             :
CLAYTON, WILLIAM J. RAINEY, JR.,          :
STEPHEN B. BROGAN, DENNIS R.              :
MARCHEI, WALTER P. GARRISON, II,          :
LANCE HITZELBERGER, VICTOR                :
MOLINARI, JOSEPH PIERSON,                 :
KEVIN PRZYBYSZEWSKI, OFFICER              :
FOLEY, MARK KONNICK, and                  :
JOHN DOE 1-9,                             :
                                          :
            Defendants.                   :
_____      :

**KUGLER**, United States District Judge:

          This matter raises allegations of individual and systemic police violations of Plaintiffs'

constitutional rights.  Presently before the Court is 1) a Motion for Summary Judgment by

Plaintiffs Pastor Richard Beatty, Pastor Leola Beatty, and Harry Hampton (Docket No. 25); and

2) a Motion for Summary Judgment by Defendants Elk Township, Elk Township Police

Department, Mayor William J. Rainey, Jr., Chief Stephen B. Brogan, Walter P. Garrison, II,

1

Lance Hitzelberger, Victor Molinari, Joseph Pierson, and Kevin Przybyszewski (collectively, the "Elk Defendants") (Docket No. 28).  For the reasons discussed below, the Plaintiffs' Motion is denied and the Elk Defendants' Motion is granted in part and denied in part.

## I.      BACKGROUND

This case presents what is either an unfortunate series of police encounters, or a systemic, coordinated effort of personal animus.  The recounting must begin at 535 8th Avenue, Elk Township, New Jersey.  Plaintiffs Pastors Richard and Leola Beatty own the lot and a three-bedroom house at that location.  The Beattys bought the house on April 12, 2005, from the prior owners–the Factions.  The home is located in the "Lawns" section of Elk Township.  This area, which borders Elk Township and the Borough of Clayton, is a known high crime area.  The Beattys have never lived at 535 8th Avenue, and in fact have lived for 26 years in Sicklerville, New Jersey.

Hampton moved into the house sometime in 2006.  As is important to one of the counts in the Complaint, Hampton is African-American as are the Beattys.  Hampton has only a sixth grade education and is illiterate.  Hampton lived at the house alone, but occasionally his young son visited and stayed.

### A.      The October 31, 2006 Incident

On October 31, 2006, Halloween night, Sergeant Walter Garrison was patrolling the Lawns section of Elk when he saw a blue light on in the second floor of 535 8th Avenue.  Apparently Sergeant Garrison had known the previous owners of the house and was aware that they had moved out.  He was apparently unaware, however, that the house had subsequently been sold to the Beattys, who then permitted Hampton to live there.  Thus, Sergeant Garrison was

2

under the belief that the home was vacant, and therefore believed that the blue light was suspicious.  He believed perhaps a squatter or some kind of other trespasser was inside.

Garrison called for backup and parked some distance away from the house.  Though the exact timing is unclear, Garrison was joined by fellow Elk Township police officers Corporal Victor Molinari, Officer Kevin Przybyszewski, and Officer Joseph Pierson.  The four officers were seemingly the only four on duty at the time.  Garrison and Przybyszewski approached the front door, while at least one other officer covered the back.  Garrison knocked on the door, and several minutes later, it was answered by Hampton.  At some point before Hampton answered the door, Officer Przybyszewski knocked on the door across the street to see if anyone had moved in to 535.  Officer Przybyszewski learned that a man had been seen going into the house, but that no one had ever moved in.

Exactly what happened after Hampton answered the door is quite in dispute.  Garrison seemingly immediately asked Hampton who he was and whether he had identification.  By his own deposition testimony, Hampton claims that he said nothing to the officers, but turned and went upstairs.  See Elk br.(#28), Ex. H at 108:15.  Also, despite there being only four officers on duty, Hampton claimed that he was greeted at the door by nine or ten officers.  See Elk br.(#28), Ex. H at 106:7.  Sergeant Garrison, alternatively, testified that Hampton responded that he lived there, but that his ID was upstairs.  See Elk br.(#28), Ex. S at 15:1-12.  Garrison testified that Hampton allegedly told the officers they could come in.  Id.  Hampton flatly refutes that he gave consent to the officers to enter.  See Pl. 56.1 stmt.(#25) at ¶ 16.

It is, however, undisputed that the officers did enter the house.  Sergeant Garrison and Officer Przybyszewski followed Hampton upstairs, seemingly for "their safety."  Elk 56.1

stmt.(#28) at ¶ 26.  Corporal Molinari and Officers Pierson stayed downstairs.  Upstairs, Sergeant

Garrison saw a room with a mattress with no bedframe on the floor, a light, and a window

covered with plastic and a blue blanket (thus the blue light he saw from outside).  He also saw an

electric space heater and a television.  Both Garrison and Przybyszewski went into the room

while Hampton retrieved his ID.  After Hampton found it, Garrison ordered Przybyszewski to

perform a warrant check, which he did and which came back clear.  Garrison went downstairs

while Przybyszewski stayed with Hampton.  At this point, Przybyszewski performed a patdown

on Hampton after he asked him if he had any weapons.  Hampton points out a number of times

that he was in his pajamas during this entire encounter.

Meanwhile downstairs, Garrison phoned Mayor Rainey because he was concerned that

the house did not have a valid certificate of occupancy (CO).  At the time, Mayor Rainey was on

patrol with Crime Watch, a group of volunteer citizens who act as the eyes and ears of police on

certain dates, such as Halloween.  Mayor Rainey also served on the Elk Township Committee as

the Public Safety Director, which meant he was the liaison between the Chief of Police and the

Committee.  Rainey immediately responded and met Garrison on the front steps of the house.

Garrison informed him of his concerns and Rainey expressed that he did not know whether the

house had a valid CO, and expressed that he did not have access to that information after hours

since it was in the closed construction office.  Rainey nevertheless went inside.  At that time,

Officer Przybyszewski and Hampton were both downstairs as were Pierson, Molinari, and

Garrison.

Hampton then seemingly asked why everyone was in the house, and Garrison responded

that he saw a light on and he thought the house was vacant.  Hampton then explained that he was

there because he was a house-sitter for Pastor Richard Beatty.  Hampton seemingly explained to

the group that Pastor Richard Beatty was at church, and he attempted to give them the phone

number.  See Pl. 56.1 stmt.(#25) at 37.  No one ever called Pastor Beatty, though it is disputed on

the record whether Hampton insisted that they call, or insisted that they should not call.

Compare, Elk br.(#28), Ex. S at 29:16-20 (Garrison deposition), with Elk br.(#28), Ex. H at

119:5-9 (Hampton deposition).

At this point, the Elk Defendants maintain that Mayor Rainey walked through the house

and made a brief inspection of the utilities, checking to see if the water in the kitchen worked and

that the downstairs toilet flushed.  See Elk 56.1 stmt. at ¶ 30.  According to Hampton, however,

Mayor Rainey checked the sink and the toilet, searched the kitchen, looked through the cabinets,

and looked in the refrigerator.  Pl. 56.1 stmt.(#25) at ¶¶ 39-40.  Mayor Rainey then said that the

CO issue could be sorted out in the morning and left.  The officers followed suit and ended the

encounter.  It seems as if none of the Elk Defendants ever followed up with either the

construction office or with the Beattys.

## B.    The December 11, 2006 Incident

Harry Hampton also claims he had a run-in with some unknown, and as yet, unidentified

police officers on December 11, 2006.  Hampton testified that an officer in an unmarked car

stopped him while he was riding his bike.  The officer got out of his car, asked for ID, and

indicated that Hampton was riding on the wrong side of the road.  Another officer approached the

scene and ran Hampton's name for outstanding warrants.  Hampton was not arrested or cited for

the violation and was permitted to leave.  Hampton still has not identified which officer or police

department stopped him on December 11, 2006, and indeed the Elk Police Department has no

report concerning the alleged encounter.  See Elk 56.1 stmt.(#28) at ¶ 53; Pl. 56.1 stmt.(#36) at ¶ 53 (admitted).

### C.    The December 12, 2006 Incident

Hampton was also involved with Elk Township Police and Borough of Clayton Police on December 12, 2006.  That incident is covered at length in a companion Opinion issued this date.

### D.    The January 7, 2007 Incident

Finally, Hampton had another encounter with police on January 7, 2007.  On that date at 10:50 p.m., Officer Lance Hitzelberger of Elk Township saw Hampton riding his bike without a headlight or lamp, which is a violation of New Jersey law.  Hitzelberger stopped him and spoke with Hampton, who appeared to be upset.  Hampton identified himself and said that Hitzelberger could not harass him.  Hitzelberger responded that he was not harassing him, but that Hampton was pulled over because he had no lamp.  Hampton said it had fallen off.  About that time, Officer Przybyszewski showed up and identified Hampton.  Hampton was then let go with a warning.

### E.    Procedural History

On the basis of these events, Plaintiffs filed a ten count complaint on May 7, 2008, alleging various federal and state law violations.  Unfortunately, Plaintiffs' Complaint is not a model of clarity and thus exactly what is claimed against whom is unclear.  In a very general manner, the counts can be summarized as follows:[1]

---

[1] Plaintiffs stipulated to the dismissal of all claims against the County of Gloucester and the Gloucester County Sheriff, who were originally defendants in this action.  See Docket No. 9. Plaintiffs also stipulated to the dismissal of Plaintiff City Harvest World Outreach Church, an original plaintiff.  See Docket No. 20.

6

| Count: | Caption: | Causes of Action: | Defendants: |
|---|---|---|---|
| Count I | "Police and Mayor's Search of 535 8th Avenue and Seizure of Plaintiff Harry Hampton" | 1) N.J. Const.<br>2) 42 U.S.C. § 1983<br>3) N.J.S.A. § 10:5-1 (New Jersey Law Against Discrimination (LAD))<br>4) N.J.S.A. § 10:6-1 (New Jersey Civil Rights Act (NJCRA)) | 1) Township of Elk<br>2) Elk Police<br>3) Mayor Rainey<br>4) Chief Brogan<br>5) Officer Garrison<br>6) Officer Molinari<br>7) Officer Pierson<br>8) Officer Przybyszewski<br>9) John Does 1-10 |
| Count II | "Illegal Seizure of Plaintiff Harry Hampton during Search of 535 8th Avenue" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Township of Elk<br>2) Elk Police<br>3) Mayor Rainey<br>4) Chief Brogan<br>5) Officer Garrison<br>6) Officer Molinari<br>7) Officer Pierson<br>8) Officer Przybyszewski<br>9) John Does 1-10 |
| Count III | "Violations of Freedom to Assemble and Right to Exercise Religion by Entering and Searching of 535 8th Avenue" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) "Defendants" |
| Count IV | "December 12, 2006 Stop of Harry Hampton" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Township of Elk<br>2) Elk Police<br>3) Borough of Clayton<br>4) Clayton Police<br>5) Officer Garrison<br>6) Officer Molinari<br>7) Officer Pierson<br>8) Officer Foley<br>9) Chief Brogan<br>10) Chief Marchei<br>11) Officer Konnick |
| Count V | "January 1, 2007 Stop of Harry Hampton" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Township of Elk<br>2) Elk Police<br>3) Officer Hitzelberger<br>4) Chief Brogan<br>5) Officer Przybyszewski |
| Count VI | "December 11, 2006 Stop and Seizure of Harry Hampton" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) John Does 11 through 20<br>2) "Defendants" |
| Count VII | "Elk Township Police Department" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Chief Brogan<br>2) Township of Elk<br>3) Elk Police |

| | | | 4) Mayor Rainey |
|---|---|---|---|
| Count VIII | "Borough of Clayton and Clayton Police" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Borough of Clayton<br>2) Clayton Police<br>3) Chief Marchei |
| Count IX | "Mayor, Elk Township, and Gloucester County" | 1) § 1983<br>2) LAD<br>3) NJCRA | 1) Elk Township |
| Count X | "Racial Discrimination" | 1) N.J. Const.<br>2) § 1983<br>3) LAD<br>4) NJCRA | 1) Elk Township<br>2) Borough of Clayton<br>3) Elk Police<br>4) Clayton Police<br>5) Chief Brogan<br>6) Chief Marchei<br>7) Officer Garrison<br>8) Officer Hitzelberger<br>9) Officer Molinari<br>10) Officer Pierson<br>11) Mayor Rainey<br>12) Officer Foley<br>13) Officer Konnick<br>14) John Does 1-10<br>15) John Does 11-20 |

The Plaintiffs filed their Motion on October 29, 2009. The Elk Defendants filed their

Motion two days later. All parties have appropriately briefed the Motions and they are now ripe

for review.[2]

_____

[2] As a housekeeping matter, the Court is compelled to point out several procedural deficiencies with the present Motions. First, Plaintiffs' statement of material facts not in dispute, see Docket No. 25, fails to conform in part with the purpose and spirit of Local Civil Rule 56.1. Plaintiffs' statement contains a direct quotation of N.J. Stat. Ann. § 40A:14-118, see Pl. 56.1 stmt.(#25) at ¶ 49, which most assuredly is not a "fact" that is not in dispute. Moreover, paragraphs 46-52 of Plaintiffs' statement are really just legal argument. The Rule 56.1 statement of facts is not the place for argument. See Globespanvirata, Inc. v. Texas Instruments, Inc., No. 03-2854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005). Plaintiffs are reminded to comply with the letter of Rule 56.1 in future filings.

The Court further notes that neither the supporting brief nor the brief in opposition, see Docket Nos. 28, 35, regarding the Elk Defendants' Motion contains the required table of contents and table of authorities. See L. Civ. R. 7.2(b). These tables assist the Court in deciding pending motions should be included in all briefs.

Finally, the Court notes that the Elk Defendants filed an overlength brief in support of their Motion, without leave of the Court. Compare L. Civ. R. 7.2(b), (d) (setting page limit at 40

## II.    STANDARD

Summary judgment is appropriate where the court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson</u>, 477 U.S. at 255).

"[T]he party moving for summary judgment under Fed.R.Civ.P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact."  <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party satisfies its burden, the nonmoving party must respond by "set[ting] out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."  <u>Id.</u>

---

pages in 14 font or 30 pages in 12 font), <u>with</u> Docket No. 28 (containing 43 pages of 12 font). While the Court could rightly disregard the excess pages or deny the Motion altogether, in the interests of justice, the brief will be considered as submitted.  However, the Elk Defendants are admonished to comply with Rule 7.2 in the future.

III.   **DISCUSSION**

As there are presently two pending motions for summary judgment, the Court will lay

here the precise grounds on which each movant seeks judgment.  Plaintiffs seek summary

judgment on three grounds:

> 1) the Elk Defendants are liable as a matter of law under 42 U.S.C. § 1983 for the
> October 31, 2006 search of the home at 535 8th Avenue and the seizure of Hampton's
> person;
>
> 2) the officers and Mayor Rainey violated Plaintiffs' rights under Article I, Paragraph 7 of
> the New Jersey Constitution; and
>
> 3) Elk Township is liable under § 1983 because Mayor Rainey was the final policy-maker
> for Elk and he personally violated the Fourth Amendment or he acquiesced in the
> officers' violation of the Fourth Amendment.

The Elk Defendants seek summary judgment on eleven grounds:

> 1) the officers and Mayor Rainey are entitled to qualified immunity;
>
> 2) the Elk Township officers were merely performing their community caretaking
> function on October 31, 2006;
>
> 3) Plaintiffs Richard and Leola Beatty lack standing to bring any claims;
>
> 4) all claims against Elk Township fail because Plaintiffs cannot demonstrate that their
> injuries were caused by a policy or custom or by the Township's failure to train,
> supervise, or discipline its employees;
>
> 5) Chief Brogan is entitled to summary judgment as to all claims because he was not on
> active duty at the time of any incident;
>
> 6) the Elk Township police officers' actions in speaking to Hampton on two occasions
> when he was riding his bike do not give rise to a cause of action;
>
> 7) Elk Township cannot be liable for punitive damages as a matter of law under § 1983;
>
> 8) Plaintiffs are not entitled to punitive damages under federal or state law because the
> officers' actions were neither malicious or wanton;

9) no evidence exists of racial discrimination;

10) any common law claims are barred by the tort threshold in the New Jersey Tort Claims Act; and

11) the officers are entitled to good faith immunity.

The Court now turns to each respective ground.

### A.      Qualified Immunity

The analysis must begin with qualified immunity.  Qualified immunity protects government officials from liability for civil damages where their performance of discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Government officials are entitled to qualified immunity unless, 1) "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right," and 2) "the right was clearly established" at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).  A right is clearly established if "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "If officers of reasonable competence could disagree on th[e] issue, immunity should be recognized."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  The Saucier two-part inquiry is no longer mandatory, and courts are permitted to use discretion as to which prong to apply first. Giles v. Kearney, 571 F.3d 318, 325 (3d Cir. 2009) (citing Pearson v. Callahan, 129 S. Ct. 808, 818 (2009)).  Qualified immunity is a question of law, but disputed issues of material fact will preclude summary judgment on qualified immunity.  Id.

11

Here, the officers (Garrison, Przybyszewski, Molinari, and Pierson) and Mayor Rainey separately argue that they are entitled to qualified immunity. Elk br.(#28) at 31-35. As to prong one of the inquiry, disputed questions of material fact preclude the Court from finding whether the Elk Defendants violated a constitutional right, as will be discussed further below. As to the second prong, however, the Court is compelled to find that the right to be free from a warrantless search or seizure in one's home absent an exigency was clearly established as of October 31, 2006. See Payton v. New York, 445 U.S. 573, 590 (1980). The Court has not been directed to any authority showing why the circumstances facing the Elk officers and Mayor Rainey in this dispute were not subject to well-established constitutional parameters. Thus, whether or not any Elk Defendant is entitled to summary judgment on the basis of qualified immunity depends entirely on whether Plaintiffs' rights were violated.

**B.      Search and Seizure on October 31, 2006**

Plaintiffs first argue that they are entitled to summary judgment because no dispute exists as to whether Garrison, Przybyszewski, Molinari, Pierson, and Mayor Rainey violated the Fourth Amendment when they entered 535 8th Avenue, and when they detained Hampton on October 31, 2006. Pl. br.(#25) at 3. The Elk Defendants respond that the Beattys lack standing to bring a claim and that the Elk Defendants' actions were appropriate under the community caretaking doctrine. Elk. br.(#33) at 4, 6. The Elk Defendants further argue that they had consent to enter the house and that Hampton was never seized under the Fourth Amendment. Elk br.(#33) at 18, 21. The Court finds that genuine issues preclude entry of summary judgment as to either the alleged search or the alleged seizure.

12

### 1.      Search of the Home

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  Police are generally required to obtain a warrant based on probable cause before a search or a seizure.  Terry v. Ohio, 392 U.S. 1, 20 (1968).  In particular, the Fourth Amendment "has drawn a firm line at the entrance to the house."  Payton, 445 U.S. at 590.  This means that absent an exigency, police may not enter a home without a warrant.  Id.

Of course a well-established exception to the warrant requirement is consent.  United States v. Crandell (Crandell I), 554 F.3d 79, 87-88 (3d Cir. 2009).  Whether a party validly gave consent to a search is determined by a totality of the circumstances test.  See id.  Factors in the inquiry include "[1] the setting in which the [search] consent was obtained, [2] the parties' verbal and non-verbal actions, and [3] the age, intelligence, and educational background of the party." Id. (quoting United States v. Wilson, 413 F.3d 382, 388 (3d Cir. 2005)) (quotations removed). An officer requesting consent need not inform the citizen of his right to refuse consent, though such a warning is a factor in determining whether the consent was freely given.  United States v. Drayton, 536 U.S. 194, 206-07 (2002).

In this dispute, the parties seem to agree that no exigency existed permitting a warrantless entry into 535 8th Avenue.  Instead, the heart of dispute seems to be that the Elk officers believed they had consent to enter the home, and once inside, they discovered a potential health and safety issue that justified further investigation by Mayor Rainey.  See Elk br.(#33) at 18. Plaintiffs of course counter that Hampton never gave consent to enter to the officers, and definitely did not give consent to Mayor Rainey.  Pl. br.(#25) at 4-5.  Plaintiffs further argue that even if Hampton gave consent, it was not voluntary.  Pl. br.(#25) at 5-6.

13

As to Garrison, Przybyszewski, Molinari, and Pierson, the Court finds that genuine issues preclude summary judgment. Garrison directly testified that Hampton told the officers they could come in. See Elk br.(#28), Ex. S at 15:1-12 (Garrison deposition). Hampton flatly refutes that contention. See Pl. 56.1 stmt.(#25) at ¶ 16; Elk br.(#28), Ex. H at 108:15 (Hampton deposition). Under these circumstances, the Court cannot weigh evidence to determine which party correctly represents the facts. Therefore, Plaintiffs' Motion must be denied as to the purported search by Garrison, Przybyszewski, Molinari, and Pierson.

The same result must also be reached as to Mayor Rainey. There is no dispute in the record that Hampton did not give consent to Mayor Rainey to enter 535 8th Avenue. Instead, it was Sergeant Garrison who invited Mayor Rainey into the home. See Pl. br.(#25), Ex. G at 1 (police report regarding October 31, 2006); Elk br.(#28), Ex. Q at ¶ 2 (Rainey interrogatory answers). However, the Court cannot say that Mayor Rainey's actions in response to Sergeant Garrison's request to enter was unreasonable as a matter of law. Certainly a reasonable juror could find that if Hampton gave consent to the officers to enter, and after doing so the officers saw potential health and safety issues, it was reasonable for Garrison to contact someone who had some familiarity with the health and safety standards, e.g., the Mayor. See Pl. br.(#25), Ex. K at 20-24 (Rainey deposition, noting familiarity with certificate of occupancy standards). A reasonable juror could also determine that Mayor Rainey's potentially (though disputed) brief search of the sink and the toilet were reasonable. Therefore, the Court must deny summary judgment.

### a.      Community Caretaking

The Elk Defendants offer that they are entitled to summary judgment because their

actions on October 31 were permissible under the community caretaking function.  See Elk

br.(#28) at 27; Elk br.(#33) at 6.  The Court does not agree.

The community caretaker doctrine "recognizes that the police perform a multitude of

community functions apart from investigating crime.  In performing this community caretaking

role, police are 'expected to aid those in distress, combat actual hazards, prevent potential

hazards from materializing and provide an infinite variety of services to preserve and protect

public safety.'"  United States v. Smith, 522 F.3d 305, 313 (3d Cir. 2008) (citing United States v.

Coccia, 446 F.3d 233, 238 (1st Cir. 2006)), cert. denied, 129 S. Ct. 488 (2008); see also State v.

Brogan, 975 A.2d 377, 384 (N.J. 2009) (holding "police officers perform a wide range of social

services, such as aiding those in danger of harm, preserving property, and 'creat[ing] and

maintain[ing] a feeling of security in the community'").  The Supreme Court has recognized that

community caretaking functions are "totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal statute."  Cady v. Dombrowski, 413

U.S. 433, 441 (1973).  The doctrine is an exception to the warrant requirement, and police

searches or seizures while in pursuit of community caretaking functions are reasonable in some

circumstances.  Cf. Ray v. Twp. of Warren, No. 07-2812, 2009 WL 3074776, at *4-5 (D.N.J.

Sept. 23, 2009).  At least one court has narrowly defined the community caretaking function as

"abating a nuisance."  See Antoine ex rel. Antoine v. Rucker, No. 03-3738, 2006 WL 1966649,

at *6 (D.N.J. July 12, 2006).

In this dispute, the record clearly discloses that the officers' actions on October 31, 2006

were not, at least initially, related to aiding the distressed, combating or preventing an actual

hazard, or protecting public safety.  Indeed, Sergeant Garrison testified that the officers "wanted

to approach the house because of the area, the area has–had been having burglaries within some sort of time frame.  I don't have an exact time frame.  Within that area, we had been having a lot of break-ins and also we have been known to have squatters that may come use vacant houses for drug use or whatever use there."  Elk br.(#28), Ex. S at 14:2-8 (Garrison deposition).  This statement reveals the officers' true initial intent: investigation of crime.  Thus, the Elk Defendants' actions at the outset should have comported with the Fourth Amendment.

However, the Elk Defendants also seemingly argue that once they were inside home, they engaged in their community caretaking function by investigating whether it was fit for habitation. See Elk br.(#28) at 30.  At this juncture, the Court cannot say that Elk Defendants' subsequent actions were permissible, given that whether the Defendants were validly in the home in the first place is in dispute.  Cf. United States v. McGough, 412 F.3d 1232, 1239 (11th Cir. 2005) (holding police entry into home to get child's shoes and where police subsequently found guns and drugs not permitted under community caretaking doctrine where no danger to child and no exigency); Brogan, 975 A.2d at 386 (holding "[s]o long as the police ha[ve] an independent basis for entering [an] apartment under the community caretaking exception that was not a pretext for carrying out an investigatory search, we find no bar under . . . our federal and state constitutions" for a search or seizure).  Therefore, the Elk Defendants' Motion for Summary Judgment cannot be granted on community caretaking grounds.

### b.      Standing

The Elk Defendants also offer that they are entitled to summary judgment since the Beattys lack standing to bring a claim for a search of the house at 535 8th Avenue.  See Elk br.(#28) at 22; Elk br.(#33) at 4.  They assert that the Beattys had mere legal ownership of the

16

property and had not exhibited an expectation of privacy.  Elk br.(#28) at 23.  Plaintiffs counter

that the Beattys do have standing because they had a shared possessory interest with Hampton.

Pl. br.(#35) at 13.  The Court finds that Defendants have failed to show a lack of genuine issues

of material fact, and their Motion is denied.

While the parameters of when a landlord has standing to assert a constitutional claim

based on a search of a tenant's property are not well-defined, some factors and principles have

emerged.  For instance, it is well-established that ownership of property alone is insufficient to

confer standing.  See Georgia v. Randolph, 547 U.S. 103, 110 (2006) (holding Fourth

Amendment rights are "not limited by the law of property").  The owner must instead have 1) "a

reasonable expectation of privacy in the property searched" and 2) must "manifest a subjective

expectation of privacy in the property searched."  See United States v. Baker, 221 F.3d 438, 441

(3d Cir. 2000).  Courts that have applied these principles have looked to a number of factors to

determine whether a landlord has standing.

These factors include: 1) whether the landlord had access to the property, 2) stayed there,

or 3) maintained personal items there.  See Miller v. Hassinger, 173 Fed. Appx. 948, 952 (3d Cir.

2006); see also Bonds v. Cox, 20 F.3d 697, 701 (6th Cir. 1994) (no standing where owner was

not occupying house during search and allowed another to live there while she was out of state);

Diblasi v. Borough of E. Rutherford, No. 05-1980, 2006 WL 2246374, at *6 (D.N.J. Aug. 3,

2006) (no standing where landlord did not reside at searched apartments); Godshalk v. Borough

of Bangor, No. 03-1465, 2004 WL 999546, at *10 (E.D. Pa. May 5, 2004) (no standing where

landlords did not reside at property, never resided at the property, and were not present for the

search).  Factors also include whether the owner had 1) a proprietary or possessory interest in the

property, 2) the right to exclude others, 3) taken precautions to maintain privacy, 4) exhibited a

subjective expectation of privacy, or 5) whether the landlord was legitimately on the premises.

See Shamaeizadeh v. Cunigan, 338 F.3d 535, 544-45 (6th Cir. 2003); see also Looney v. City of

Wilmington, Delaware, 723 F. Supp. 1025, 1031 n.9 (D. Del. 1989) (no standing where landlord

had no right to live in the apartment).  Factors might also include whether the landlord 1) had

immediate right to exclusive possession of the property, 2) lived in the property, 3) kept personal

clothing there, 4) had a key to the property, 5) frequently used the property, or 6) had permission

to frequently use the property.  See United States v. Rios, 611 F.2d 1335, 1344 (10th Cir. 1979).

Against this background, the Elk Defendants have not met their initial burden at summary

judgment of pointing out that no genuine issue exists for trial.  The Elk Defendants note, and it is

undisputed, that the Beattys have never lived at 535 8th Avenue.  See Elk br.(#28) at 23.

However, from there they conclude that the Beattys lack standing.  While indeed bare legal

ownership is insufficient to confer standing, likewise mere tenancy by another is insufficient to

strip standing.  The Elk Defendants have not met their burden of showing that the Beattys

manifested no expectation of privacy in 535 8th Avenue.  The record does not reveal, and the

Defendants have not articulated, whether, for example, the Beattys had regular access or

maintained personal items there.  Indeed, according to the Plaintiffs, Hampton was a mere guest,

see Pl. br.(#35) at 16, which seems to infer the Beattys maintained a contemporaneous right of

possession.  Further, the Court's own review of the record reveals that perhaps the Beattys indeed

maintained property at 535 8th Avenue, such that they had an expectation of privacy.  See Elk

br.(#28), Ex. F at 114:4-7 (Richard Beatty deposition) ("[Hampton] said they're gone, he said,

but they held me up in the room and they searching all in the house, all in your things and

18

everything."). In sum, the Defendants have not met their initial summary judgment burden.

Therefore, the Court denies the Elk Defendants' Motion on the basis that the Beattys lack standing to assert a claim based on the search of 535 8th Avenue.

### 2.    Seizure of Hampton

Plaintiffs also seek summary judgment as to the alleged seizure of Hampton's person on October 31, 2006. They argue that the police had no reasonable and articulable suspicion that Hampton was committing a crime. See Pl. br.(#25) at 7. The Elk Defendants counter that the entire encounter was consensual. See Elk br.(#33at 21-22. Genuine issues of material fact also preclude summary judgment as to the seizure of Hampton.

The Supreme Court has held that a warrantless seizure of a person for purposes of a brief investigatory detention (a/k/a "a Terry stop") is reasonable absent a warrant, provided the officer has "a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Reasonable suspicion is an objective standard requiring "particularized justification." See United States v. Crandell (Crandell I), 554 F.3d 79, 84 (3d Cir. 2009) (citing United States v. Mendenhall, 446 U.S. 544, 551 (1980)). "'Reasonable suspicion [required for a Terry stop] is a less demanding standard than probable cause [necessary for an arrest] and requires a showing considerably less than preponderance of the evidence . . . . [R]easonable suspicion can arise from information that is less reliable than that required to show probable cause.'" Id. (quoting United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000)). At bottom, reasonable suspicion is a totality of the circumstances test. See United States v. Johnson, 592 F.3d 442, 448-49 (3d Cir. 2010).

A court's first step in a Fourth Amendment challenge is to determine if the person was

actually seized.  See Crandell I, 554 F.3d at 84.  Not every encounter between police and the public is a seizure.  Id.  Indeed, the Supreme Court has held that a "seizure does not occur simply because a police officer approaches an individual and asks a few questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991); see also United States v. Drayton, 536 U.S. 194, 200-01 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.").  Police can pose questions, ask for identification, and even request to search, provided they do not obtain consent through "coercive means."  Drayton, 536 U.S. at 201.  Where a person has the ability to "engage in or terminate the encounter," it is "consensual" and does not implicate the Fourth Amendment.  Crandell I, 554 F.3d 84 (citing United States v. Wilson, 413 F.3d 382, 386-87 (3d Cir. 2005)).  A consensual encounter does not require reasonable suspicion.  Id. (citing United States v. Kim, 27 F.3d 947, 950 (3d Cir. 1994)).

    Under the Fourth Amendment, a seizure only occurs "when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  Terry, 392 U.S. at 19-20 n.16.  The "show of authority" test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person" in light of all the surrounding circumstances.  California v. Hodari D., 499 U.S. 621, 628 (1991) (citing Mendenhall, 446 U.S. at 554).  Factors in this inquiry include:

> [1] the threatening presence of several officers, [2] the display of a weapon by an officer, [3] some physical touching of the person of the citizen, or [4] the use of language or tone of voice indicating that compliance with the officer's request might be compelled.  In the

absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

Mendenhall, 446 U.S. at 554-55 (internal citations omitted).

In this dispute, the entire encounter took place within Hampton's home.  As noted above, whether he gave consent to the officers to enter is in dispute.  The officers' subsequent actions are also in dispute.  The Elk Defendants allege that once they were validly inside Hampton's home with his consent, they merely asked questions of him and he responded.  See, e.g., Elk br.(#28), Ex. M. at ¶ 2 (Przybyszewski interrogatory answers); Ex. S at 21:14-18 (Garrison deposition).  They allege that they displayed no force and that did not threaten.  Elk br.(#33) at 22.  On the other hand, Hampton testified that he was scared by the officers' presence and that he was asked certain seemingly threatening questions, such as "do you get high?"  See Pl. br.(#25), Ex. D at 119:24, 121:5-6.  Hampton also testified that he was patted down.  See Pl. br.(#25), Ex. D at 111:10.  Under these disputed circumstances, the Court cannot determine, without weighing evidence, if Hampton were seized on October 31, 2006, or if the Elk Defendants had reasonable suspicion.  These questions of fact are for a jury and summary judgment must be denied.

**C.   Article I, Paragraph 7 of the New Jersey Constitution**

Plaintiffs also move for summary judgment on the basis that the alleged search and seizure on October 31, 2006 violated Article I, Paragraph 7 of the New Jersey Constitution.[3]  Pl. br.(#25) at 21.  Plaintiffs argue that the New Jersey Constitution provides a greater level of

_____

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized."  N.J. Const. Art. 1, ¶ 7.

scrutiny to consent searches.  Id.  The Elk Defendants generally allege that they did not violate

the New Jersey Constitution, though they do not specifically address it.  See Elk br.(#33) at 21-

22.  The Court finds that disputed questions of fact preclude summary judgment.

In brief, the New Jersey Constitution affords greater protection than does the Fourth

Amendment to the United States Constitution.  See State v. Carty, 790 A.2d 903, 907 (N.J.

2002).  Specifically in the context of consent searches, a person must have knowledge of the right

to refuse consent.  State v. Johnson, 346 A.2d 66, 68 (N.J. 1975).  This does not mean that the

person must be specifically advised that he has a right to refuse, but the state has a burden of

demonstrating knowledge.  Id.  In this dispute, whether or not Hampton had knowledge of his

right to refuse consent is disputed.  Specifically, it seems as if perhaps Hampton himself offered

to let the officers enter, as opposed to them requesting it.  See Elk br.(#28), Ex. S at 15:11.  In

other words, they did not request consent to search; he offered it.  Under these circumstances, the

Court cannot grant Plaintiffs' Motion.

> **D.     Elk Township Liability–Mayor Rainey's Actions; Policy or Custom; or
> Failure to Train, Supervise, or Discipline**

Plaintiffs next assert that they are entitled to summary judgment against Elk Township.

Plaintiffs specifically argue that Mayor Rainey was the final policy-maker in the area of police

matters, therefore his direct conduct, or acquiescence in the conduct of the police, permits

municipal liability under § 1983.  Pl. br.(#25) at 15-16.  The Elk Defendants also move for

summary judgment in favor of Elk Township, arguing that 1) there is no proof of an

unconstitutional policy or custom, 2) no proof of pattern of unconstitutional conduct by

Township employees of which the it was aware, and 3) no proof that the Township failed to train,

supervise, or discipline its police officers or other employees.  Elk br.(#28) at 15.  The Court will deny Plaintiffs' Motion and grant the Elk Defendants' Motion.

Before turning to the law, the Court must note a few matters at the outset.  First, in light of the Court's decision above that it is disputed whether any of the Elk Defendants violated the Constitution on October 31, the Court is compelled to deny Plaintiffs' Motion, regardless of Mayor Rainey's status as a final policy-maker.  There can be no municipal liability where no constitutional rights have been violated.  Second, the scope of the present inquiry is limited to whether Mayor Rainey was a final policy-maker in the area of police matters.  Plaintiffs offered no response to the Elk Defendants' well-reasoned brief pointing out that Plaintiffs have failed to show any evidence of a pattern of unconstitutional conduct or proof of a failure to train, supervise, discipline.  Therefore, the Court must grant the Elk Defendants' Motion for all claims alleging liability for Elk Township on the basis of a deliberate ignorance of a pattern or practice of unconstitutional conduct, or on the basis of a failure to train, supervise, or discipline.

Under § 1983, a local government entity, such as a township or municipality, cannot be held liable solely on a theory of respondeat superior.  Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978).  Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Id. at 694.  In other words, a municipality is only liable for the actions of an individual employee or officer when that person's conduct "implements official policy or custom."  Hill v. Borough of Kutztown, 455 F.3d 225, 245 (3d Cir. 2006).

An individual's actions implements official policy or custom in several circumstances,

including when

> (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

Id. (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 478-84 (1986); McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005); LaVerdure v. County of Montgomery, 324 F.3d 123, 125-26 (3d Cir. 2003)).  In the present dispute, only conditions two and three are potentially invoked; that is, the issue is whether Mayor Rainey was a final policy-maker such that his conduct represented official policy (condition two), or whether he was an official policy-maker such that his acquiescence in a violation by Elk Township officers can be imputed to the Township (condition 3).  Cf. Pl. br(#25) at 15-16.

To determine if an official has final policy-making authority, the court must determine "(1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, . . . and (2) whether the official's authority to make policy in that area is final and unreviewable."  Id. (internal citations and emphasis removed).

The state law at issue here is first N.J. Stat. Ann. § 40A:14-118.  That statute provides that the governing body of a municipality may create a police force.  The statute further provides that a municipality by ordinance may provide for a line of authority and for the appointment of a chief, including defining his duties.  The chief of police established by this statute is the head of the police force, and he shall, pursuant to policies established by the "appropriate authority"

24

perform five specific tasks, including administering and enforcing the rules and regulations.  <u>Id.</u>

Appropriate authority is defined as "the mayor, manager, or such other appropriate executive or

administrative officer, such as a full-time director of public safety, or the governing body or any

designated committee or member thereof . . . ."  <u>Id.</u>

Pursuant to § 40A:14-118, the Elk Township committed adopted the Elk Police

Department Rules and Regulations.  <u>See</u> Pl. br.(#25), Ex. L.  Three provisions of those rules are

relevant to the Court's inquiry into whether Mayor Rainey had final policy-making authority:

> 1.2.1. <u>Rules and Regulations Established</u>.  The Elk Township Committee hereby adopts and promulgates the Elk Township Police Departments [sic] Rules and Regulations, hereinafter referred to as the "Rules."
>
> 1.2.2. <u>Right to Amend or Revoke</u>.  In accordance with N.J.S.A. 40A:14-118, the Township Committee of the Township of Elk reserves the right to amend or revoke any of the Rules contained herein.
>
> 4.3.1. <u>Duties</u>.  Pursuant to N.J.S.A. 40A:14-118 and the Elk Township Code, the Chief of Police shall be the head of the Police Department and shall be directly responsible to the Mayor and Committee for its efficiency and day-to-day operations.  Pursuant to polices established by the Mayor and the Committee, the Chief of Police shall have the following duties . . . .

<u>See</u> Pl. br.(#25), Ex. L.

Plaintiffs argue that Mayor Rainey had final policy-making authority "in the area of Elk

municipal police matters" because he was the mayor, an executive and administrative officer, the

director of public safety, and a part of the Elk governing body.  Pl. br.(#25) at 18.  They

seemingly argue that his level of interactions with the Chief of Police, including acting as a go-

between for the Committee, and because he presides over the executive body imputes to him

final decision-making authority.  <u>See</u> Pl. br.(#25) at 19.  On the basis of the relevant law, the

Court cannot agree.

The particular area of municipal business in question here is police matters in Elk Township.  In this area of municipal business, the Mayor's ability to make policy, whatever it may be, is not final and unreviewable.  Under § 4.3.1, it does seem as if the Mayor has some ability to set some policies that control some of the Chief of Police's duties, though exactly what ability the Mayor has is unclear.  For example, the Rule may mean as little as the Mayor can set the policies for how the Chief will report to the Mayor, see § 4.3.1(e), or it may mean that the Mayor *and/or* the Committee set the Chief's duties, or perhaps the Mayor *and* the Committee must both agree on the Chief's duties.  However, regardless of what policy-making ability the Mayor has under § 4.3.1, it seems clear that under § 1.2.2, the Committee and the Committee alone retains the ability to amend or revoke any Rule, which seemingly would extend to whatever policy is set between the Mayor and the Chief of Police.  In other words, any policies set by the Mayor are not final and unreviewable.  He is not a final policy-maker in the area of police matters, and his actions or acquiescence in the actions of others cannot be imputed to Elk Township.

Therefore, the Court must deny Plaintiffs' Motion and grant the Elk Defendants' Motion as to Elk Township.  Elk Township will be terminated as a party to this matter.

### E.    Chief Brogan

Within their discussion of the lack of liability for Elk Township, the Elk Defendants also moved for summary judgment as to all claims against Chief Stephen Brogan.  See Elk. br.(#28) at 20.  Plaintiffs did not respond.  According to Stephen Brogan's undisputed answers to interrogatories, he was on terminal leave from the Elk Township Police Department during all of the events alleged in the Complaint.  Elk br.(#28), Ex. L at ¶ 2.  Seemingly Lieutenant Charles

26

DeFalco was the officer in charge during Brogan's absence.  Elk br.(#28), Ex. L at ¶ 12.  Since

Plaintiffs have otherwise failed to respond to the Elk Defendants' Motion and have not otherwise

pled any specific acts by Chief Brogan, and the Court finding no basis in the record for imposing

liability upon him, the Elk Defendants' Motion is granted.  Chief Brogan will be terminated as a

party to this matter.

### F.    The Bicycle Stops

The Elk Defendants move for summary judgment as to the bicycle stop on January 7,

2007, alleged in Count V, and the alleged stop on December 11, 2006, alleged in Count VI.  See

Elk br.(#28) at 38.  As to the January 7, 2010 stop, the Elk Defendants argue that the stop was

justified by reasonable suspicion, since Hampton admittedly was riding his bicycle at night

without a lamp.  Id.  As to the alleged December 11 stop, the Elk Defendants argue that it was

also justified by reasonable suspicion since Hampton admits he was riding on the wrong side of

the road.  Id. at 38-39.  Notably in their Rule 56.1 statement, the Elk Defendants point out that

Hampton does not know which officers or indeed which department stopped him on December

11.  Elk 56.1 stmt.(#28) at ¶ 53; Pl. 56.1 stmt.(#35) at ¶ 53 (admitted).  Plaintiffs' only response

to the Elk Defendants' brief is a conclusory statement that these incidents were part of a pattern

of abuse and that the validity of the stops is disputed.  Pl. br.(#35) at 37-38.  The Court disagrees

with Plaintiffs and finds that summary judgment is appropriate.

First, as to the January 7 stop, it is undisputed that Hampton was riding his bike in

violation of New Jersey law, which is why Officer Hitzelberger stopped him.  See Elk 56.1

stmt.(#28) at ¶ 54; Pl. 56.1 stmt. (#35) at ¶ 54 (admitted).  The entire encounter was brief and

Hampton was not touched or searched in any way.  See  Elk 56.1 stmt.(#28) at ¶¶ 56-58; Pl. 56.1

stmt. (#35) at ¶¶ 56-58 (admitted).  Certainly Hitzelberger's observation of a violation of the law justified his stop.  Cf. State v. Amelio, 962 A.2d 498, 500 (N.J. 2008) ("A lawful stop of an automobile must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed."), cert. denied, 129 S. Ct. 2402 (2009).  Therefore, the Court grants the Elk Defendants' Motion as to the January 7 stop alleged in Count V.

Second, as to the alleged December 11 stop, the Court must also grant summary judgment.  Hampton admits that he was riding his bike in violation of New Jersey law, which justified a stop.  See Elk 56.1 stmt.(#28) at ¶ 54; Pl. 56.1 stmt. (#35) at ¶ 51 (admitted).  Perhaps more importantly, Plaintiffs as yet have failed to identify which if any officers stopped Hampton and which police department the officers worked for.  On the basis of the record before the Court, no reasonable juror could find for Plaintiffs because they have not shown who, if indeed anyone, did anything to Hampton.  Therefore, the Court grants the Elk Defendants' Motion as to the December 11 stop alleged in Count VI.

G.     Punitive Damages under § 1983 & Punitive Damages under State and Federal Law

The Elk Defendants also move for summary judgment as to any claim for punitive damages.  See Elk br.(#28) at 21, 36.  They argue that municipalities are immune from punitive damages under § 1983.  See Elk br.(#28) at 21 (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981)).  They further argue that Plaintiffs have failed to produce evidence showing that the Elk Defendants' actions were reckless or involved a callous indifference to a federally protected right, or that their actions were wantonly reckless or malicious.  See Elk

br.(#28) at 36.  Plaintiffs first concede that Elk Township cannot be liable for punitive damages under § 1983.  Plaintiffs further argue that a jury could determine that on the basis of the Elk Defendants' actions in each incident in this dispute, the Elk Defendants were motivated by malicious intent.  See Pl. br.(#35) at 33-37.  With the exception of the claim for punitive damages against Elk Township, which is otherwise moot given the analysis above, the Court disagrees with the Elk Defendants and finds disputed issues of material fact for trial.

The Third Circuit has held that "for a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous.  Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard."  Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989).  Likewise under New Jersey law, "[t]o warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious.  There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another."  Nappe v. Anschelewitz, Barr, Ansell & Bonello, 477 A.2d 1224, 1230 (N.J. 1984).  The punitive damages inquiry requires consideration of the defendant's subjective intent, which is a "poor subject" for summary judgment.  Green v. Corzine, No. 09-1600, 2010 WL 1133445, at *7 (D.N.J. Mar. 22, 2010).

Here, Plaintiffs persuasively point out that a reasonable juror could conclude that the number and manner of police interactions in this case could give rise to an inference of the requisite state of mind.  See Pl. br.(#35) at 35.  For example, during the October 31 incident, every officer on duty entered Hampton's home.  Id.  The Court agrees that on the facts alleged and in dispute, a reasonable juror could find that the Elk Defendants' actions were motivated by

29

reckless or callous indifference to Plaintiffs' rights.  Therefore, the Court denies the Elk

Defendants' Motion as to the punitive damages claims.

>    **H.**    **Racial Discrimination**

The Elk Defendants also move for summary judgment as to Count X, which alleges racial

discrimination against Plaintiffs.  Elk br.(#28) at 24.  The Elk Defendants argue that the Plaintiffs

have failed to come forward with any evidence to prove intentional race-based discrimination.

Id.; Elk reply(#46) at 3.  Plaintiffs refute that assertion and argue that the four encounters with

police raise an inference of discrimination.  Pl. br.(#35) at 17-18.  The Court disagrees and finds

no evidence upon which a juror could reasonably find racial discrimination.

At the outset the Court must note two things about Count X.  First, the claim appears to

only seek relief on behalf of Harry Hampton.  See Compl. at ¶ 100 ("WHEREFORE, Plaintiff

Harry Hampton demands judgment . . .").  Second, on exactly which grounds Plaintiffs seek

relief is somewhat unclear.  In particular, Plaintiffs allege that Defendants "violated the

plaintiff's rights under Article 1, paragraphs 1 and 5, of the Constitution of the State of New

Jersey protected under 42 U.S.C. § 1983, and in violation of N.J.S.A. 10:5-1 et seq. and N.J.S.A.

10:6-1 et seq."  Compl. at ¶ 100.  What is remarkable about this claim is that it appears to allege

that Plaintiffs can seek relief under § 1983 for violation of their rights under the New Jersey

Constitution.  This is simply not so.  See Magnuson v. Cassarella, 812 F. Supp. 824, 830 n.5

(N.D. Ill. 1992) ("[T]ransgression of the protection of a state constitution may not form the basis

of a § 1983 claim." (citing Pesce v. J. Sterling Morton High Sch., Dist. 201, Cook County, Il.,

830 F.2d 789, 795(7th Cir. 1987))).  However, since all parties have briefed the matter as if all

Plaintiffs stated a claim, and as if they have otherwise stated a claim under § 1983, the Court will

examine the Equal Protection Clause of the Fourteenth Amendment and its counterpart, Article

1, Paragraphs 1 and 5 of the New Jersey Constitution.

The Equal Protection Clause provides that no state shall "deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  This is not a command

that all persons be treated alike, but rather a direction that all persons similarly situated be treated

alike. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "The central

purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of

official conduct discriminating on the basis of race."  Washington v. Davis, 426 U.S. 229, 239

(1976), or any other suspect classification.  To make an equal protection claim, a plaintiff must

prove that the defendants' actions (1) had a discriminatory effect and (2) were motivated by a

discriminatory purpose.  Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S.

252, 264-66 (1977).  With a claim based on improper motive, if a defendant meets his initial

burden at summary judgment, the plaintiff must "identify affirmative evidence from which a jury

could find that the plaintiff has carried his or her burden of proving the pertinent motive."  See

Crawford-El v. Britton, 523 U.S. 574, 599 (1998).  In the race discrimination context, such

evidence may include 1) a clear pattern that is otherwise inexplicable other than on race grounds,

2) disparate impact, 3) historical background, 4) specific sequence of events, or 5) departures

from a normal procedural sequence, or 6) substantive departures from a normal sequence.  See

Arlington Heights, 429 U.S. at 266-68 (discussing race discrimination in re-zoning proposal); see

also Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992) (citing Arlington Heights),

aff'd, 998 F.2d 1002 (3d Cir. 1993).  Importantly, Article 1, Paragraphs 1 and 5 of the New

Jersey Constitution are analyzed in the same fashion as the Equal Protection Clause of the United

States Constitution.  <u>See</u> <u>Joyce v. City of Sea Isle City</u>, No. 04-5345, 2008 WL 906266, at *21 (D.N.J. Mar. 31, 2008).

The Court finds that Plaintiffs have not  met their burden of coming forward with affirmative evidence.  Plaintiffs note that it is either a strange coincidence that Hampton was stopped on four different occasions in a short period of time, or it is clear proof of racial animus. <u>See</u> Pl. br.(#35) at 17.  However, even assuming the Elk Defendants violated the Fourth Amendment in every stop, Plaintiffs offer nothing about those stops to show that race could have been a motivating factor.  Plaintiffs have no direct proof (e.g., a stray comment), and certainly offered nothing by way of indirect evidence, using the factors from <u>Arlington Heights</u>, to show animus (e.g., Plaintiffs did not show that African-Americans were stopped more by Elk officers than other individuals or perhaps the Elk Defendants used different procedures in stopping African-Americans than other individuals).  The Court is unpersuaded that Plaintiffs' status as minorities alone supports putting Count X to a jury.  <u>Cf.</u> <u>Flagg</u>, 806 F. Supp. at 1223 ("Conclusory allegations of generalized racial bias do not establish discriminatory intent.").

Therefore, the Court must grant the Elk Defendants' Motion as to Count X.

I.      **New Jersey Tort Claims Act Tort Threshold & Good Faith Immunity**

The Elk Defendants last move for summary judgment on any claims in the Complaint under New Jersey common law because Plaintiffs have failed to meet the tort threshold of the New Jersey Tort Claims Act (NJTCA), N.J. Stat. Ann. § 59:1-1 et seq., and because the Elk Defendants are entitled to good faith immunity.  Because the Court finds that the Complaint does not state any common law claims, the Elk Defendants' Motion is denied.  <u>Cf.</u> <u>McGuire v. Twp.</u> <u>of Waterford</u>, No. L-7502-05, 2007 WL 598666, at *6 (N.J. Super. Ct. App. Div. Feb. 28, 2007)

(holding the NJTCA does not apply to constitutional violations or civil rights violations).

**J.      John Does**

Finally, the Complaint lists as Defendants John Does 1-10, and John Does 11-20. Under Federal Rule of Civil Procedure 21, "the court may at any time, on just terms, add or drop a party." A court may drop John Doe defendants under this rule. See Blakeslee v. Clinton County, 336 Fed. Appx. 248, 250 (3d Cir.2009); Adams v. City of Camden, 461 F. Supp. 2d 263, 271 (D.N.J. 2006). Because discovery is now complete, see Docket No. 21 (Amended Scheduling Order), because Plaintiffs have failed to identify any John Doe Defendants, and because Plaintiffs have not moved to amend the Complaint, the Court dismisses John Does 1-10 and 11-20.

**IV.      CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment. The Court **DENIES** the Elk Defendants' Motion for Summary Judgment as to qualified immunity, community caretaking doctrine, standing, punitive damages, and the defenses under the NJTCA. The Court further **GRANTS** the Elk Defendants' Motion as to all claims against Elk Township, all claims against Chief Brogan, all claims in Count V, all claims in Count VI, and all claims in Count X. The Court **TERMINATES** Elk Township and Chief Brogan as parties to this civil action. Finally, the court **DISMISSES** John Does 1-10 and 11-20. An accompanying Order shall follow.

Date:   4-14-10                                    /s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge

33